

NUMBER 13-09-00059-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

**BELEN GARZA,**                                                                              **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                                            **Appellee.**

## On appeal from the 105th District Court
## of Kleberg County, Texas.

## MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Yañez and Garza**
**Memorandum Opinion by Chief Justice Valdez**

Appellant, Belen Garza, was charged by indictment with twenty-three counts of credit card abuse, a state-jail felony. *See* TEX. PENAL CODE ANN. § 32.31(b)(1)(A), (d) (Vernon Supp. 2009). A jury found Garza guilty of all counts, and the trial court assessed punishment at two years' confinement in a state jail for each count with the sentences to

run concurrently. The trial court subsequently suspended the sentence, placed Garza on community supervision for three years, and ordered her to pay $345 in court costs and restitution in the amount of $3,866.40. By two issues, Garza argues that the evidence is: (1) legally insufficient to establish that Thomas Trigo was the holder of the credit card; and (2) legally and factually insufficient to prove that Garza committed credit card abuse. We affirm.

## I. BACKGROUND

This dispute pertains to the alleged unauthorized usage of a company credit card by Garza. On May 22, 2009, a Kleberg County grand jury charged Garza with twenty-three counts of abuse of a "Wright Express Credit Card #XXXX XXXXX XXXX 0063" with the intent to fraudulently derive a benefit and without the consent of the cardholder, Thomas Trigo. The indictment further provided that the incidents of credit card abuse transpired on various dates between September 21, 2007 and October 22, 2007.

Prior to trial, on July 31, 2008, Garza filed a first amended motion to quash the indictment, alleging that it lacked sufficient specificity to charge her with separate offenses. She also alleged that the indictment failed to state the appropriate criminal mental state and to give notice about "the name, address, or other identifying information where the alleged wrongdoing occurred . . . ." After a hearing, the trial court denied Garza's motion to quash.

The jury trial in this matter commenced on December 1, 2008. The State called two witnesses—Lydia Cantu and Manuel Thomas Trigo ("Thomas")—to testify, and Garza, Joanna Perales, and Marisol Lopez testified on behalf of the defense.

2

## A. Cantu's Testimony

Cantu, owner of Mid Valley EMS, testified that Thomas worked for the company as a director and that his duties included "running the day-to-day operations of the business." Cantu noted that the company had an accounting department that handled all business accounts, including accounts receivable, and that Wright Express, a credit card company, issued company credit cards to her and Thomas. These cards were used to fill the company's ambulances with diesel fuel.

On cross-examination, Cantu admitted that she was not knowledgeable about all of the "day-to-day operations" of the business, but she recalled that the company owned approximately fifteen ambulances. Cantu stated that she and Thomas were the cardholders of the credit cards. Later, defense counsel questioned Cantu about the company's articles of incorporation, and Cantu admitted that the corporation had been dissolved and was now operating as a sole proprietorship. Cantu also testified that each ambulance has a corresponding credit card, and each credit card is assigned a PIN number.

## B. Thomas's Testimony

Thomas, the director of operations for Mid Valley EMS, testified that he ran "all the stations from McAllen, Falfurrias, Houston[,] and surrounding areas." Thomas noted that the headquarters for Mid Valley EMS is in McAllen, Texas. Thomas recalled reviewing Garza's employment application and interviewing Garza and her friend and partner, Marisol Lopez, for positions with the company. Thomas testified that the Mid Valley EMS fleet consisted of twelve or thirteen ambulances. Thomas further testified that, when Garza was

3

first hired, he gave her a company credit card and a PIN number that was only to be used to fill up her assigned ambulance with fuel. In fact, Thomas stated that:

> Some medics get fuel cards, not all of them. I have two supervisors, myself[,] and a couple of other management that has [sic] fuel cards. I have a couple other medics that also have them because they're out in the field. And Belen Garza was one of the ones that I issued a fuel card to.

Thomas insisted that he told Garza that the ambulances were to be filled up only with diesel fuel even though none of these instructions were in writing.[1] Thomas also: (1) identified the last four digits of the credit card that Garza was issued as being 0063; (2) stated that all of the Mid Valley EMS credit cards that were issued began with the following numbers: "0444 XXXXX XXXX"; and (3) noted that Garza never returned to him the credit card that was issued to her. Thomas also testified that he instructed Garza to try to fill up the ambulance at the Stripes gas station located at Highways 281 and 285 in Falfurrias as much as possible. The reason for this was because Valero, the parent company of the Stripes gas station, keeps good records of the gas transactions. Regarding the PIN number, Thomas told Garza not to "give anybody your [PIN] number" and that if problems arose, she was to call Thomas to get authorization to act.

On cross-examination, Thomas acknowledged that he was not able to provide evidence of Garza's time cards because those records were located in the McAllen headquarters and were destroyed during Hurricane Dolly. However, Thomas stated that he made the schedules for the medics and posted them in the various offices. When presented with transaction logs associated with the credit card that was allegedly issued to Garza that were produced by the fraud division of Wright Express, Thomas noted that

---

[1] Trigo later testified that, "[y]ou can't put unleaded fuel in an ambulance. If you put unleaded fuel in an ambulance, you'll burn the engine."

4

the majority of the entries on the documents identified "B. Garza," whom Thomas identified as the defendant, as the purchaser. Thomas also admitted that Garza was a good medic and that her employment record did not contain any complaints. He also acknowledged that he gave Garza the credit card because he trusted her and that not all drivers for the company were granted permission to use the credit cards.

On re-direct examination, Thomas recounted numerous instances in which Garza allegedly used the credit card assigned to her to purchase large quantities of unleaded fuel "a couple of times a day" from September 21, 2007 to November 2, 2007. Among the many entries on the Wright Express documents were unleaded fuel purchases purportedly made by Garza on several Sundays during the relevant time period, which, as Thomas noted, were suspicious because Mid Valley EMS is closed on Sundays. Thomas admitted that Garza and Lopez drove long distances between San Diego, Texas, and Robstown, Texas, to pick up clients; however, most of the entries reflected that "B. Garza" purchased unleaded gasoline at Shell, ExxonMobil, and Diamond gas stations in Kingsville, Texas, a location that was not serviced by Garza or her partner. Moreover, many of the purchases were made during times in which Thomas testified that Garza was not scheduled to work. Thomas testified that the total of unauthorized charges made on the credit card issued to Garza amounted to in excess of $6,000, and that he found out about the purported credit card abuse upon reviewing large increases in the amount owed to Wright Express for unleaded fuel on the credit-card statements.[2] When asked to describe the front of the credit card, which he was unable to produce at trial, Thomas recalled that the credit card had a number on it and said that it was "issued from Mid Valley EMS." In addition, Thomas

[2] Thomas noted that a Wright Express representative in the fraud division notified him that Garza "was using excessive fuel on her card and on her [PIN] number . . . ."

5

testified that, in order to purchase gasoline using the company credit card, users were required to input the designated PIN number and the odometer reading on the ambulance, and once completed, the users were issued a receipt, which was to be turned in to Mid Valley EMS supervisors. Later, Thomas specifically testified that he was the cardholder of the credit card that was issued to Garza. Finally, Thomas asserted that Garza "didn't pick up a [gas] card" when she reported for work "'cause [sic] she had it with her at all times."

The State rested at the conclusion of Thomas's testimony. Garza subsequently moved for a directed verdict, which the trial court denied.

## C.    Perales's Testimony

Perales, a dispatcher who worked for Mid Valley EMS for a month and a half, testified that she was familiar with the operation of the Falfurrias office, where Garza was stationed. Perales denied ever seeing Thomas in the Falfurrias office and noted that Michael Trigo, Thomas's brother, was the manager of the Falfurrias office. Perales testified that the ambulance drivers did not "sign off for the card" and that there was not a daily record made of which driver used which credit card. Perales also denied that Garza was ever issued a credit card by Mid Valley EMS. Perales remembered that there were four ambulances assigned to the Falfurrias office.

On cross-examination, Perales admitted that she had a verbal altercation with one of the Trigos regarding a partial payment for services she rendered. Perales further testified that the medics would fill the ambulances up with fuel at the end of their shifts and that the gas cards were turned in at the end of the day. Perales acknowledged that she did not have access to the PIN numbers allegedly issued to the medics.

6

**D.     Lopez's Testimony**

Lopez, a licensed emergency medical technician and roommate of Garza's, testified that she and Garza worked as partners at Mid Valley EMS.  Lopez denied ever working for Thomas and stated that her immediate supervisor was Michael.  Lopez noted that Michael "was in charge of the Falfurrias area" and that no gas cards ever left the Falfurrias office.  Lopez asserted that neither she nor Garza were assigned a gas card.  Lopez further asserted that:

> We'd go to the stations, the trailer, and in the trailer it's cabinets and cabinets.  It has—the cabinet is a rolling thing.  The keys are hung.  The gas cards are there.  You get the keys.  On the other side, they had like our jump bag and our AEDs and we'd have to unlock them and get those out, put the keys back, get the ambulance keys, get the fuel card, and then go and check our trucks out outside.

Lopez also testified that she and Garza often had "long, long distance transfers" that required them to "refill during the day."  Lopez stated that she and Garza did not have patients in Kingsville and that they would fill up the ambulance at the Stripes gas station in Falfurrias.  Lopez further stated that she quit working at Mid Valley EMS because Mid Valley EMS supervisors allegedly asked her to falsify documentation for Medicare and Medicaid. [3]

On cross-examination, Lopez testified that all of the medics knew the PIN numbers to the gas card and had access to the gas cards.  Lopez also testified that, on occasion, all of the medics would "go to the Falfurrias station and we'd get in line, all the ambulances.  And if we were already pumping gas, the—we'd leave and the other guys will just follow and fill up their ambulances."

---

[3] Rather than inform Mid Valley EMS that she was quitting, Lopez simply stopped "going to work."

Later, Lopez stated that "the guys [Mid Valley EMS supervisors] from the Valley" would drive "Lincoln cars" from McAllen to Falfurrias every day and would use the gas cards to fuel up the vehicles. However, Lopez admitted that the Mid Valley EMS supervisors driving from the McAllen to Falfurrias would not drive through Kingsville.

**E.     Garza's Testimony**

Garza stated that she worked as an intermediate EMT for Mid Valley EMS from August 2007 to October 2007. Garza denied ever abusing a credit card belonging to Mid Valley EMS. Garza admitted that she, Lopez, and Perales all have grievances against Mid Valley EMS, yet Garza noted that neither Lopez nor Perales would perjure themselves for Garza's benefit. Garza acknowledged that she typically worked Mondays, Wednesdays, and Fridays, but that Michael would call the medics and tell them "Tomorrow morning, be there at X time." Garza denied ever seeing a schedule posted in the Falfurrias office. Garza also denied ever being issued a credit card and a PIN number. Garza then noted that:

> When we got hired with Mid Valley, with Michael, the first day he took us in his personal vehicle to the valley to pick up an extra ambulance because he didn't have enough at the Falfurrias station for us to work the next day. We went with him. He gave us a card, two uniform shirts and said[,] "Okay, go back. Leave this card at the station. If you need it in the morning to fill up or whatever, use it."

According to Garza, the gas cards "were kept in a cabinet with the turnstile with no lock, no anything on it." Garza denied that Thomas was her boss and, instead, testified that Michael was her immediate supervisor. Garza next recounted a verbal altercation with Thomas and alleged that Mid Valley EMS supervisors "wanted us to falsify documentation about patients."

8

On cross-examination, Garza asserted that Mid Valley EMS supervisors used their "Lincoln cars" to drive from McAllen to Kingsville to pick up patients. Garza admitted that she had known Perales since 2004, when they worked together at Gold Star EMS. She also noted that Perales was the one who told her that there was a warrant out for her arrest regarding this offense. Garza denied having a credit card or a debit card and testified that she paid for her gas with cash. Garza quit working as a medic for Mid Valley EMS on October 31, 2007, when she stopped reporting to work.

On re-direct examination, Garza stated that the gas card that she had used on her last shift with Mid Valley EMS had already been turned in, and she corroborated Lopez's testimony that several ambulances would line up at the Falfurrias station and use the same gas card to fill up.

At the conclusion of the trial, the jury found Garza guilty of all twenty-three counts of credit card abuse. Because she had waived her right to have the jury impose a sentence, Garza was sentenced by the trial court. The trial court imposed a two-year sentence for each count with the sentences to run concurrently, suspended the sentence, and placed Garza on community supervision for three years. In addition, the trial court ordered Garza to pay $345 in court costs and restitution in the amount of $3,866.40. On December 12, 2008, Garza filed a motion for new trial, which was later denied by the trial court. This appeal followed.

## II. Standard of Review and Applicable Law

In reviewing the legal sufficiency of the evidence, an appellate court must review all the evidence in the light most favorable to the verdict, and ask whether "'*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable

9

doubt—not whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'" *Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009) (quoting *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979)) (emphasis in original). The trier of fact is the sole judge of the facts, the credibility of the witnesses, and the weight given to testimony. *See* TEX. CODE CRIM. PROC. ANN. art. 38.04 (Vernon 1979); *Jackson*, 443 U.S. at 318-19; *Beckham v. State*, 29 S.W.3d 148, 151 (Tex. App.–Houston [14th Dist.] 2000, pet. ref'd). We do not reevaluate the weight and credibility of the evidence, and we do not substitute our own judgment for that of the trier of fact. *King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000) (en banc); *Beckham*, 29 S.W.3d at 151. We resolve any inconsistencies in the evidence in favor of the judgment. *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).

In conducting a factual sufficiency review, a court of appeals reviews the evidence in a neutral light to determine whether the evidence is so weak that the jury's verdict seems clearly wrong and manifestly unjust or against the great weight and preponderance of the evidence. *Neal v. State*, 256 S.W.3d 264, 275 (Tex. Crim. App. 2008); *Watson v. State*, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006). Unless the record clearly reveals that a different result is appropriate, we must defer to the fact-finder's determination concerning the weight to be given to contradictory testimony. *Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008).

The State is not required to present direct evidence, such as eyewitness testimony, to establish guilt. *See Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004). "Circumstantial evidence is as probative as direct evidence in establishing guilt of the actor, and circumstantial evidence alone can be sufficient to establish guilt." *Hooper v. State*,

10

214 S.W.3d 9, 13 (Tex. Crim. App. 2007); *see Guevara*, 152 S.W.3d at 49. The law does not require that each fact "point directly and independently to the guilt of the appellant, as long as the cumulative effect of all the incriminating facts is sufficient to support the conviction." *Hooper*, 214 S.W.3d at 13; *see Guevara*, 152 S.W.3d at 49.

Both legal and factual sufficiency are measured by the elements of the offense as defined by a hypothetically correct jury charge. *Grotti v. State*, 273 S.W.3d 273, 280-81 (Tex. Crim. App. 2008); *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997); *see Adi v. State*, 94 S.W.3d 124, 131 (Tex. App.–Corpus Christi 2002, pet. ref'd). "'Such a charge [is] one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof, or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried.'" *Villarreal v. State*, 286 S.W.3d 321, 327 (Tex. Crim. App. 2009) (quoting *Malik*, 953 S.W.2d at 240).

Under the Texas Penal Code, a person commits the offense of credit card abuse if she knowingly presents or uses a credit card or debit card with the intent to obtain a benefit fraudulently and "the card, whether or not expired, has not been issued to him and is not used with the effective consent of the cardholder." TEX. PENAL CODE ANN. § 32.31(b)(1)(A); *see Harrell v. State*, 852 S.W.2d 521, 524 (Tex. Crim. App. 1993). Section 1.07 of the penal code defines "benefit" as "anything reasonably regarded as economic gain or advantage, including [a] benefit to any other person in whose welfare the beneficiary is interested." TEX. PENAL CODE ANN. § 1.07(a)(7) (Vernon Supp. 2009). Furthermore, a "cardholder" is defined as "the person named on the face of a credit card or debit card to whom or for whose benefit the card is issued." *Id.* § 32.31(a)(1); *see*

11

*Olurebi v. State*, 870 S.W.2d 58, 61 (Tex. Crim. App. 1994).

A person acts knowingly "with respect to the result of his conduct when he is aware that his conduct is reasonably certain to cause the result." TEX. PENAL CODE ANN. § 6.03(b) (Vernon 2003). Intent to commit credit card abuse may "be inferred from circumstantial evidence[,] such as acts, words, and the conduct of the appellant." *See Guevara*, 152 S.W.3d at 50; *Lee v. State*, 962 S.W.2d 171, 174 (Tex. App.–Houston [1st Dist.] 1998, pet. ref'd) (stating that a cardholder's lack of effective consent may be proven solely by circumstantial evidence); *see also Hayes v. State*, Nos. 01-07-00238-CR, 01-07-00239-CR, 2008 Tex. App. LEXIS 3163, at *10 (Tex. App.–Houston [1st Dist.] May 1, 2008, pet. ref'd) (mem. op., not designated for publication).

## III. ANALYSIS

By her first issue, Garza contends that the evidence demonstrating that Thomas Trigo was the cardholder was legally insufficient because Mid Valley EMS was the actual cardholder. Additionally, by her second issue, Garza contends that the evidence supporting her conviction is legally and factually insufficient because the State failed to prove that the credit card number alleged in the indictment was the number of the card that she allegedly abused. She further asserts that the State failed to prove that she derived any benefit from the card. The State argues that: (1) Garza failed to preserve for review any alleged defects to the form of the indictment; and (2) the evidence is legally and factually sufficient to support her conviction.

## A. Substantive Error in the Indictment

We agree with the State's contention that Garza's first issue constitutes a challenge

12

to the substance of the indictment. In making her first argument, Garza repeatedly mentions that the evidence indicates that Thomas Trigo was not the cardholder and that the State could not have sustained its burden in proving credit card abuse because the indictment allegedly stated the wrong cardholder. In other words, Garza argues that the indictment contains a substantive defect because it should have reflected that the cardholder was Mid Valley EMS rather than Thomas Trigo.

Article 1.14(b) of the Texas Code of Criminal Procedure provides that:

If the defendant does not object to a defect, error, or irregularity of form or substance in an indictment or information before the date on which the trial on the merits commences, he waives and forfeits the right to object to the defect, error, or irregularity and he may not raise the objection on appeal or in any other post conviction proceeding.

TEX. CODE CRIM. PROC. ANN. art. 1.14(b) (Vernon 2005); *see Sanchez v. State*, 120 S.W.3d 359, 367 (Tex. Crim. App. 2003); *see also Salahud-Din v. State*, 206 S.W.3d 203, 212 (Tex. App.–Corpus Christi 2006, pet. ref'd) ("Since omitting an element from an indictment is a defect of substance in an indictment, it naturally follows that the indictment is still an indictment despite the omission of that element."). Here, counsel filed a motion to quash the indictment, which was denied by the trial court; however, at no point did Garza object to the allegedly erroneous listing in the indictment of Thomas Trigo, as opposed to Mid Valley EMS, as the cardholder. *See* TEX. PENAL CODE ANN. § 32.31(a)(1) (defining a cardholder as "the person named on the face of a credit card or debit card to whom or for whose benefit the card is issued"). Because counsel did not object to the error contained in the indictment before trial, this issue is not preserved. *See* TEX. CODE CRIM. PROC. ANN. art. 1.14(b); *see also Sanchez*, 120 S.W.3d at 367; *Salahud-Din*, 206 S.W.3d at 212. Accordingly, we overrule Garza's first issue.

13

**B.    Legal and Factual Sufficiency**

With regard to her second issue, we hold that the evidence supporting Garza's conviction is legally and factually sufficient.  We base our conclusion on the testimony at trial reflecting that numerous unauthorized charges for unleaded gasoline were made by "B. Garza" at various gas stations in Kingsville from September 21, 2007 to November 2, 2007.  Thomas identified Garza as "B. Garza" and noted that the gas could only be purchased by using the PIN number that he had issued to Garza.  Thomas also testified that the ambulances could only be filled up with diesel gasoline since unleaded gasoline would burn up the engines of the ambulances.  Thomas stated that many of the unauthorized purchases were made during times when Garza was not on duty as a medic for the company, including Sundays when Mid Valley EMS was not open. Furthermore, both Cantu and Thomas identified Thomas as a cardholder on the credit-card account. Moreover, both Lopez and Garza admitted that they did not have any patients in the Kingsville area.

In contrast, both Garza and Lopez asserted that Mid Valley EMS supervisors used the credit card purportedly issued to Garza to fill up their "Lincoln cars" in Kingsville. Lopez, Garza, and Perales also testified that Garza was never issued a specific credit card to be used to fill up the ambulances with gas.  Further, both Garza and Lopez noted that gas cards were turned in to the Falfurrias office at the end of every shift and that several ambulances would fill up using the same gas card.  Garza and Lopez denied ever being issued a PIN number and stated that they filled up their ambulance at the Falfurrias Valero gas station.  In addition, Garza denied ever making unauthorized purchases using a Mid Valley EMS credit card.

14

However, the testimony of Perales, Lopez, and Garza is belied by the fact that each had grievances against Mid Valley EMS and that the credit card statements created by Wright Express demonstrated that "B. Garza" made numerous purchases of unleaded gasoline in excess of $6,000 at various gas stations in Kingsville. Regardless, the resolution of Perales's, Lopez's, and Garza's testimony with the apparently contradictory testimony of both Cantu and Thomas was within the province of the jury, and we must defer to jury's resolution. *See Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) ("When the record supports conflicting inferences, we presume that the fact[-]finder resolved the conflicts in favor of the prosecution and therefore defer to that determination."); *see also Curry*, 30 S.W.3d at 406; *King*, 29 S.W.3d at 562; *Beckham*, 29 S.W.3d at 151. Clearly, the jury rejected the explanations provided by Perales, Lopez, and Garza regarding the alleged unauthorized credit card purchases. *See Lancon*, 253 S.W.3d at 705 (stating that "[t]he jury is in the best position to judge the credibility of a witness because it is present to hear the testimony, as opposed to an appellate court who relies on the cold record"); *see also Davila v. State*, 147 S.W.3d 572, 575 (Tex. App.–Corpus Christi 2004, pet. ref'd) (noting that jurors are free to accept or reject any or all of a witness's testimony) (citing *Alvarado v. State*, 818 S.W.2d 100, 105 (Tex. App.–San Antonio 1991, no pet.)).

Based on the foregoing, we hold, after reviewing the evidence in the light most favorable to the verdict, that there is legally sufficient evidence to support the jury's conclusion that Garza knowingly presented the Mid Valley EMS credit card to obtain a benefit—more than $6,000 worth of unleaded gasoline—without the effective consent of the cardholders. *See* TEX. PENAL CODE ANN. § 32.31(b)(1)(A); *see also Jackson*, 443 U.S.

15

at 318-19; *Laster*, 275 S.W.3d at 517. We further hold, after reviewing the evidence in a neutral light, that the jury's verdict is not so weak that the verdict seems clearly wrong and manifestly unjust or against the great weight and preponderance of the evidence. *See Neal*, 256 S.W.3d at 275; *Watson*, 2054 S.W.3d at 414-15. Accordingly, we overrule Garza's second issue.

## IV. CONCLUSION

Having overruled both of Garza's issues, we affirm the judgment of the trial court.

_____
ROGELIO VALDEZ
Chief Justice

Do not publish.
TEX. R. APP. P. 47.2(b)
Delivered and filed the
19th day of August, 2010.